**2013-1224**
**(Reexamination Nos. 95/001,106 and 95/001,131)**

# United States Court of Appeals
# for the Federal Circuit

RAMBUS, INC.,

*Appellant,*

*v.*

MICRON TECHNOLOGY, INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board.*

## BRIEF OF APPELLEE MICRON TECHNOLOGY, INC.

HENRY A. PETRI, JR.
MICHAEL W. O'NEILL
DANIEL P. MULLARKEY
NOVAK DRUCE CONNOLLY BOVE
 + QUIGG LLP
1875 Eye Street, NW, Eleventh Floor
Washington, D.C 20006
(202) 331-7111

JAMES P. MURPHY
MARGAUX A. AVIGUETERO
NOVAK DRUCE CONNOLLY BOVE
 + QUIGG LLP
555 Mission Street, Thirty-Fourth Floor
San Francisco, CA 94105
(415) 814-6161

*Counsel for Appellee*
*Micron Technology, Inc.*

SEPTEMBER 6, 2013

# CERTIFICATE OF INTEREST

Counsel for appellee Micron Technology, Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:

    Micron Technology, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Micron Technology, Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

        None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Henry A. Petri., Jr., Donald J. Quigg, Tracy W. Druce, James P. Murphy,
    Michael W. O'Neill, Margaux A. Aviguetero, Daniel P. Mullarkey
    NOVAK DRUCE CONNOLLY BOVE + QUIGG, LLP

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. iv

TABLE OF ABBREVIATIONS ............................................................ viii

STATEMENT OF RELATED CASES ................................................... ix

I.  STATEMENT OF THE ISSUES ................................................. 1

II.  STATEMENT OF THE CASE .................................................... 1

III.  STATEMENT OF THE FACTS ................................................... 3

    A.  Claims 13, 15, and 16 ............................................... 3

    B.  Overview of the Prior Art ......................................... 4

        1.  Bennett .............................................................. 4

        2.  JEDEC .............................................................. 8

        3.  Park ................................................................... 9

    C.  Background of the Technology at Issue .................. 10

        1.  Dynamic Random Access Memory ................ 10

        2.  Synchronous Memory Devices and Interleaved Transactions ....... 11

        3.  Memory Device Response Time in the '285 Patent ...................... 13

    D.  Summary of the Board Decision ........................... 15

IV.  SUMMARY OF THE ARGUMENT ........................................ 18

V.  ARGUMENT .......................................................................... 19

    A.  Standards of Review ............................................... 19

    B.  The Board Correctly Determined that Micron Has Standing to Appeal .......... 21

        1.  Patent Office's Interpretation Should be Given *Chevron* Deference .......... 21

2.  35 U.S.C. § 315 Does Not Limit Appeal Rights to the Third Party Requester Who Initially Proposed the Rejection .................24

3.  Rambus's Hypothetical Non-Merger Scenario Is Irrelevant .........26

4.  Filing an Appeal Brief Does Not Constitute Filing Simultaneous *Inter Partes* Reexaminations of the Same Patent ............................................................................30

5.  The Board's Decision Invalidating Certain Claims Cannot Be Moot.................................................................31

C.  The Board Correctly Determined, Based on Substantial Evidence, That Bennett Discloses a Value Which Is "Representative of the Programmable Number of Clock Cycles" ................................................................32

1.  The Board Correctly Interpreted "Representative".......................32

2.  The Board's Findings Are Supported by Substantial Evidence ............................................................37

D.  Alternatively, the Board Erred in Not Adopting the Anticipation Rejections Based on JEDEC and Park .................................................46

1.  The Board Relies on an Improper Legal Standard for Priority Written Description.............................................48

2.  Proper Legal Standard for Determining Priority Written Description ..........................................................49

3.  The Memory Device "Invention" Disclosed in the '285 Patent Requires an Interface to a Narrow Multiplexed Bus ..........53

4.  The "Prior Art" to the '898 Application Was Distinguished Based on the Bus and Interface Structure ....................................58

IV. CONCLUSION.................................................................61

CERTIFICATE OF SERVICE ...........................................................63

CERTIFICATE OF COMPLIANCE.......................................................65

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Air Transp. Ass'n of Am. v. Dep't of Transp.*,
 900 F.2d 369 (D.C. Cir. 1990)................................................................28

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
 560 F.3d 1366 (Fed. Cir. 2009) ........................................... 49, 50

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
 406 F.3d 1365 (Fed.Cir. 2005) ........................................... 41, 46

*Belkin v Kappos*,
 696 F.3d 1379 (Fed. Cir. 2012) ...................................... 25, 30, 32

*Bettcher Indus., Inc. v. Bunzl USA, Inc.*,
 661 F.3d 629 (Fed. Cir. 2011) ........................................... 22, 31

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, Inc.,
 467 U.S. 837 (1984).................................................. *passim*

*City of Arlington, Texas v. F.C.C.*,
 133 S. Ct. 1863 (2013)................................................ 19, 22

*Consol. Edison Co. v. NLRB*,
 305 U.S. 197 (1938)....................................................20

*Cooper Technologies Co. v. Dudas*,
 536 F.3d 1330 (Fed. Cir. 2008) ........................................ 19, 21

*Ex parte Frye*,
 94 USPQ2d 1072 (BPAI 2010) .......................................... 37, 38

*Ex parte Pactiv Corp.*, BPAI Appeal No. 2008-5125,
 2009 WL 742669 (March 20, 2009)........................................32

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
 535 U.S. 722 (2002)....................................................50

*Hanna v. Plumer*,
 380 U.S. 460 (1965)....................................................28

*Hoover Co. v. Royal Appliance Mfg. Co.*,
   238 F.3d 1357 (Fed. Cir. 2001) ................................................20

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   645 F.3d 1336 (Fed. Cir. 2011) ........................................ 47, 48, 49

*ICU Medical, Inc. v. Alaris Medical Systems, Inc.*,
   558 F.3d 1368 (Fed. Cir. 2009) ................................. 47, 48, 52, 53

*In re Baker Hughes, Inc.*,
   215 F.3d 1297 (Fed. Cir. 2000) ................................................20

*In re Baxter Travenol Labs.*,
   952 F.2d 388 (Fed. Cir. 1991) ................................................19

*In re Berg*,
   320 F.3d 1310 (Fed. Cir. 2003) ................................................38

*In re Donaldson Co.*,
   16 F.3d 1189 (Fed. Cir. 1994) (en banc) ................................19

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ................................................20

*In re Jolley*,
   308 F.3d 1317 (Fed. Cir. 2002) ................................................20

*In re Kotzab*,
   217 F.3d 1365 (Fed. Cir. 2000) ................................................20

*In re Lovin*,
   652 F.3d 1349 (Fed. Cir. 2011) ................................................19

*In re NTP, Inc.*,
   654 F.3d 1268 (Fed. Cir. 2011) ................................................20

*In re Oetiker*,
   977 F.2d 1443 (Fed. Cir. 1992) ................................................37

*In re Sasse*,
   629 F.2d 675 (CCPA 1980) ................................................40

*In re Watts*,
    354 F.3d 1362 (Fed. Cir. 2004) ..................................................19

*In re Yamamoto*,
    740 F.2d 1569 (Fed. Cir. 1984) .................................................21

*JEM Broad. Co. v. FCC*,
    22 F.3d 320 (D.C. Cir. 1994).....................................................28

*Keystone Bridge Co. v. Phoenix Iron Co.*,
    95 U.S. 274 (1877)....................................................................32

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ................................... 51, 52, 58

*Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*,
    73 F.3d 1085 (Fed. Cir. 1995) ..................................................20

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ......................................... 21, 34

*Rambus Inc. v. Infineon Technologies Ag*,
    318 F.3d 1081 (Fed. Cir. 2003) ....................................47, 48, 49

*Tehrani v Hamilton Med., Inc.*,
    331 F.3d 1355 (Fed. Circ. 2003) ..............................................33

*Tex. Digital Sys., Inc. v. Telegenix, Inc.*
    308 F.3d 1193 (Fed. Cir. 2002) ................................................33

*Toshiba Corp. v. Imation Corp., et al.*,
    No. 2011-1204, Slip Op. (Fed. Cir. 2012)..................................43

*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed. Cir. 1998) ......................................... 49, 53

*Univ. of Rochester v. G. D. Searle & Co., Inc.*,
    358 F.3d 916 (Fed. Cir. 2004) ..................................................50

## Statutes

5 U.S.C. § 6(b) (2002)...................................................................37

35 U.S.C. § 2(a)(2)(A) .............................................................. 22, 23

35 U.S.C. § 112, ¶ 1 .....................................................................50

35 U.S.C. § 120 .............................................................................49

35 U.S.C. § 134(c) .........................................................................18

35 U.S.C. § 303(a) .........................................................................32

35 U.S.C. § 314 ..............................................................................26

35 U.S.C. § 315 ..............................................................................61

35 U.S.C. § 315(b) ................................................................. *passim*

35 U.S.C. § 317(a) (2002) ......................................................... 30, 31

35 U.S.C. § 317(b) .................................................................... 22, 31

## Regulations

37 C.F.R. § 41.61(a)(2)..................................................................28

37 C.F.R. § 41.77(a).......................................................................38

37 C.F.R. § 41.77(b) ................................................................. 32, 38

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| '285 Patent | Rambus's U.S. Patent No. 6,626,285 |
| '898 application | Application No. 07/510,898, the original parent application to which the '285 Patent claims priority |
| ACP | Action Closing Prosecution |
| Bennett | U.S. Patent No. 4,734,909, cited by the Board |
| Board | Board of Patent Appeals and Interferences (now, Patent Trial and Appeal Board) |
| DRAM | Dynamic Random Access Memory |
| JEDEC | Joint Electron Device Engineering Council (JEDEC) Standard No. 21-C, Revision 9, published 1999, cited by Micron in its reexamination request |
| Micron | Micron Technology, Inc., Third Party Requester |
| MPEP | Manual of Patent Examining Procedure |
| Park | U.S. Patent No. 5,590,086, cited by Micron in its reexamination request |
| PTO | United States Patent and Trademark Office |
| Rambus | Rambus, Inc., Patent Owner of the '285 Patent |
| RAN | Right of Appeal Notice |
| Samsung | Samsung Electronics Co., Ltd., Third Party Requester |
| VBI | Versatile Bus Interface |
| VLSI | Very large scale integrated |
| VLSIC | Very large scale integrated circuit |
| A__ | Page in Joint Appendix |
| A__(xx:yy-zz) | Joint Appendix page where xx represents a column number of a patent, yy represents the initial line of cited text and zz represents the ending line of cited text |

## STATEMENT OF RELATED CASES

Micron is unaware of any other appeals or petitions taken in this reexamination proceeding. There are, however, a number of different matters pending in this Court and other courts that involve U.S. Patent No. 6,626,285 ("the '285 Patent").

1. The following pending case involves the '285 patent.

   a. *Rambus Inc. v. Micron Technology Inc.*, No. 5:06-cv-00244-RMW (N.D. Cal.) (Whyte, J.).

2. The following pending cases do not involve the '285 Patent but involve patents that, like the '285 Patent, descend from Application No. 07/510,898 ("the '898 application").

   a. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1087 (Fed. Cir.). This case is currently pending before the Federal Circuit.

   b. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1192 (Fed. Cir.). This case is currently pending before the Federal Circuit.

   c. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1228 (Fed. Cir.). This case is currently pending before the Federal Circuit.

   d. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1339 (Fed. Cir.). This case is currently pending before the Federal Circuit.

   e. *Rambus, Inc. v. Micron Technology, Inc.*, No. 2013-1426 (Fed. Cir.). This case is currently pending before the Federal Circuit.

   f. *Micron Technology, Inc. v. Rambus, Inc.*, No. 1:00-cv-00792-SLR (D. Del.) (Robinson, J.). This case was remanded from Appeal No. 2009-1263, 645 F.3d 1311 (Fed. Cir. 2011). Following remand, the district court entered judgment in favor of Micron on February 25, 2013. Rambus filed a notice of appeal to this Court on March 27, 2013 which was assigned Appeal No. 13-1294.

g. *Rambus, Inc. v. LSI Corp.*, No. 3:10-cv-05446-RS (N.D. Cal.) (Seeborg, J.).

h. *Rambus, Inc. v. STMicroElectronics, N.V.*, No. 3:10-cv-05449-RS (N.D. Cal.) (Seeborg, J.).

i. *In re Rambus Inc.*, No. 2011-1247 (Fed. Cir. decided Aug. 15, 2012).

j. *Rambus, Inc. v. Rea*, No. 2012-1634 (Fed. Cir.) (oral arguments presented July 11, 2013).

## I. STATEMENT OF THE ISSUES

1.     Whether the Board correctly determined Micron could appeal the examiner's adverse final decision of patentability of claims 15 and 16 to the Board.

2.     Whether substantial evidence supports the Board's conclusion that claims 15 and 16 are anticipated by Bennett where the Board found that at least one embodiment of Bennett's configuration register stores "a value which is representative of the programmable number of clock cycles of the external clock" as recited in claims 15 and 16 of the '285 Patent.

3.     Alternatively, whether the Board erred in determining claims 15 and 16 have priority to the '898 application, rendering JEDEC and Park unavailable as prior art, where the '898 application plainly describes the memory invention as a multiplexed bus interface, and claims 15 and 16 therefore have no written description support in the '898 application because they do not expressly claim such an interface.

## II. STATEMENT OF THE CASE

In this case, Samsung and Micron each submitted a request for *inter partes* reexamination of claims 13, 15, and 16 of the '285 Patent. These reexamination requests were filed on November 6, 2008 and December 31, 2008, respectively. The examiner granted both requests and the PTO subsequently merged the two proceedings. (A1693-97.) The PTO merged the two proceedings and issued an

Office Action in the merged proceedings addressing all proposed rejections, regardless of whether the proposed rejection was initially raised by Samsung or Micron. (See e.g., A10553-554.)

About a year after the Office merged the proceedings, Samsung notified the Office that it would no longer participate, presumably due to a settlement agreement between Samsung and Rambus in the underlying litigation. (A1698.) However, the statute and rules require reexaminations to continue unabated even if a party stops participation and thus the examiner eventually issued a Right of Appeal Notice ("RAN") that claim 13 was unpatentable but that claims 15 and 16 were patentable. Micron elected to appeal the examiner's final decisions that claims 15 and 16 were patentable over the cited prior art before the Board.

In its Decision, the Board determined that Micron could appeal any adverse decision in the examiner's RAN regardless of the ultimate source of that issue, including the examiner's decision that claims 15 and 16 were patentable over Bennett. (A32-33; A42.) With regards to claims 15 and 16, the Board found that the examiner erred by not determining that Bennett discloses a method of operation in a memory device including "storing a value which is representative of the programmable number of clock cycles of the external clock in a programmable register on the memory device" as recited in claim 15 of the '285 Patent. (A43.)

Rambus now appeals the Board's decision that Micron had a right to appeal

and that claims 15 and 16 of the '285 Patent are anticipated by Bennett.[1]

## III.   STATEMENT OF THE FACTS

### A. Claims 13, 15, and 16

Claims 13, 15, and 16 are reproduced below with emphasis[2] on the

limitation at issue in Rambus's Appeal:

> 13. A method of operation in a memory device having a section of memory which includes a plurality of memory cells, the method comprising:
>
> receiving an external clock signal;
>
> receiving a request for a write operation synchronously with respect to the external clock signal; and
>
> sampling data, in response to the request for a write operation, after a programmable number of clock cycles of the external clock signal transpire.
>
> 15. The method of claim 13 further including storing a value which is *representative of the programmable number of clock cycles* of the external clock in a programmable register on the memory device.
>
> 16. The method of claim 15 further including receiving a set register request, wherein in response to the set register request, the memory device stores the value in the register.

(A90(25:41-50, 25:57-64) (emphasis added).)

---

[1] Rambus does not appeal the Board's (and examiner's) finding that claim 13 is anticipated by Bennett.

[2] All emphasis in this brief is added by Micron unless otherwise noted.

### B. Overview of the Prior Art

#### 1. Bennett

Bennett describes a highly versatile interconnection scheme to provide high performance, economical resources, and flexible configuration that was designed to become the standard interface for a "myriad [of] devices." (A1406(12:14-25).) Of particular relevance to this appeal, Bennett describes the interconnection of VLSIC "User" devices over a Versatile Bus. (A1406(12:28-32); A1418(35:59-61).) Bennett states that User device can be "a central processor or a memory or whatever." (A1420 (40:52-55); A1418(35:59-62).)

"Each Versatile Bus Interface Logics services a User as well as communicating across the Versatile Bus with other Versatile Bus Interface Logics. Therefore, an interface is presented to the User, which may be on a separate chip or, as is more common, will be on the same physical substrate upon which the Versatile Bus logics are implemented in VLSIC." (A1425(50:7-17); A1418(36:19-25).) In addition, Bennett employs a synchronous protocol over the Versatile Bus to interconnect the Users. (A1433-34(66:9-67:18); A37-38(¶B7).)

As an example of how memory is accessed, Bennett discloses Figure 38 where "device A and device B are processors that predominantly respectively reference memories device C and device D" over the synchronous Versatile Bus. (A1449(97:7-10) (internal numbering omitted).)

4



**Bennett Figure 38 (A1171) (annotated)**

The versatility of Bennett's interface is provided by programming a configuration register within the interface, which instructs the interface to operate according to the selected configuration values. (A1149.) Each User device contains a configuration register that can be programmed. (A1409(17:9-19); A1149.) Each configuration register has eight configuration parameter values, stored in the configuration register as configuration parameters I through VIII. (A1408(15:33-35); A36-37(¶B5) (citing A1443(86:31-32).) Among other things, these values control how and when information will be sent between devices on the Versatile Bus. (A1443(85:49-86:41).)

| CONF. DIGIT | ARBITRATION | | | SLAVE ID/ FUNCTION | | WAIT AND DATA | | |
|---|---|---|---|---|---|---|---|---|
| | I GROUP LINES | II NO. OF GROUPS | III ARB. CHOICES | IV SLAVE ID/ FUNCTION LINES | V SLAVE ID/ FUNCTION CYCLES | VI WAIT LINES | VII DATA LINES | VIII DATA WORD BITS |
| 6 | 16 | | | 16 | 16 | | 32 | 32 |
| 5 | 8 | 8 | | 8 | 8 | 4 | 16 | 16 |
| 4 | 4 | 4 | SPEC/ PPLD | 4 | 4 | 2 | 8 | 8 |
| 3 | 2 | 2 | SPEC/ MPX | 2 | 2 | 1 | 4 | 4 |
| 2 | 1 | 1 | FIXED/ PPLD | 1 | 1 | 0 | 2 | 2 |
| 1 | MPX | 0 | FIXED/ MPX | MPX | 0 | MPX | 1 | 1 |
| REF FIGURE | 20 | 20 | 20 | 22 | 22 | 23 | 24 | 24 |
| ASSOCIATED MAX. PIN COUNT | 8 | 0 | 0 | 8 | 0 | 1 | 16 | 0 |
| CONFIGURATION REG. BITS | 0-2 | 3-5 | 6-8 | 9-11 | 12-14 | 15-17 | 18-20 | 21-23 |

*Fig. 3*

**Bennett Figure 3 (A1149)**

For this appeal, the main issue centers on parameter VI entitled "Wait Lines." This parameter controls how many bus lines will be exclusively dedicated to transmitting Wait signal information, with configuration values 3 and 1 being most important to this appeal.[3] (A1441(81:63-67).) A configuration value of 3 provides one pin dedicated for the Wait signal while a configuration value of 1 provides that the Wait signal and Data will be multiplexed on the same pin (*i.e.*, Wait and Data share the same pin). The primary distinction between these two

---

[3] Wait is a signal sent by a slave device (*e.g.*, a memory device) to the master that indicates whether the slave device is able to accept data in the transaction. The Wait signal gives an indication of whether, or how long it will be before, the data transfer could successfully occur. (A1438(75:54-76:30).)

6

options is that when Wait and Data are multiplexed on the same pin, the transmission of Data is delayed because the pin must first be used to send the Wait signal.

Bennett provides numerous examples illustrating the timing of transactions that occur across the Versatile Bus in the various configurations. One of the first in-depth examples is provided in Figures 25a-h. (A1442-44(84:65-87:56).) This set of figures describes a configuration in which each action takes only one clock cycle and helps the reader understand the basics of how the configuration parameters affect the timing of transactions. (A1442-44 (84:65-87:56).)

In one example, reproduced below, Bennett discloses for Figure 25a that the configuration register stores the value 122121 as parameters I through VI. (A1443(85:49-86:41).) This configuration value results in a transaction cycle time of 4 clock cycles. (A1443(85:49-86:41).) In Figure 25b, the configuration register stores the value 122123 as parameters I through VI. This configuration – which is the same as Figure 25a except parameter VI is changed from a "1" to a "3" – results in a transaction cycle time of 3 clock cycles. (A1443(85:49-86:41).)



[Parameters I-VI: 122121]          [Parameters I-VI: 122123]

**Bennett FIGs. 25a-b (A1160)**

As seen in the figures and described in Bennett, the change of parameter VI from 1 to 3 results in a "reduction in total transaction times from 4 clock cycles to 3 clock cycles." (A1443(86:31-41).) Conversely, the change of parameter VI from 3 to 1 inserts an additional clock cycle between the operation code and the output of data that results in a one clock cycle delay in outputting data.

Therefore, Bennett discloses a configurable register on the User memory device. The configurable register stores configuration parameters that include parameter VI which can be configured to include or not an extra clock cycle of delay before the transmission of data.

**2. JEDEC**

JEDEC provides a standard according to which compliant controllers and synchronous memory devices must operate. (A10038-10134.) The standard includes pinouts as well as functional requirements and timing diagrams for

8

synchronous DRAMs. (A10151.) Control signals CAS, RAS, WE, etc., are used to instruct the memory device to perform certain operations such as Read, Write, Read with Auto Precharge, and Write with Auto Precharge. (*See* A10140 (Table 3.11.5.1-1.)) JEDEC discloses a register which stores a value that is representative of an amount of time to transpire after which the memory device outputs the first amount of data. (A10037-10134; A10153; A10158.)

JEDEC was published in 1999 and was presented as prior art during the reexamination proceeding. Though JEDEC was published after the alleged priority date of the '285 Patent, Micron argued, on appeal to the Board, that JEDEC must constitute prior art because claims 15 and 16 are not entitled to an effective filing date earlier than the May 8, 2000 filing date of the '285 Patent. (A1755-67.)

### 3. Park

Park describes a "synchronous dynamic random access memory which is capable of accessing data in a memory cell array disposed therein in synchronism with a system clock from an external system such as a central processing unit (CPU)." (A10288(1:9-14).) Figures 5a and 5b of Park disclose activate, read, write, precharge, and refresh operations and show a command that is sampled synchronously with respect to external clock CLK. (A10227(FIGs. 5a-b).) Park discloses a register which stores a value that is representative of an amount of time to transpire after which the memory device outputs the first amount of

data. (A10289(4:59-61); A10290(5:1-2); A10293(11:22-26); A10306(38:9-12); A10243; A10246; A10282.)

Park was filed on December 29, 1995 and was issued on December 31, 1996. Though Park was filed after the alleged priority date of the '285 Patent, Micron argued, on appeal to the Board, that Park must constitute prior art because claims 15 and 16 are not entitled to an effective filing date earlier than the May 8, 2000 filing date of the '285 Patent. (A1755-67.)

### C. Background of the Technology at Issue

#### 1. Dynamic Random Access Memory

Much of the discussion provided in Rambus's brief pertaining to the background of the technology addresses synchronous DRAMs. (Rambus's Br. at 12-15.) However, the claims are not limited to DRAMs, as claims 15 and 16 simply recite "a memory device." Because the claims are not limited to DRAM devices, Rambus's attempt to distinguish Bennett from a DRAM device rather than the claimed "memory device" is irrelevant. Bennett undisputably discloses a synchronous memory device. (A1433-34(66:9-67:18); A37-38(¶B7).)

Next, Rambus alleges that synchronous DRAMs were not known prior to 1990. (Rambus's Br. at 13). To the extent DRAMs are relevant, the evidence of record directly contradicts Rambus's allegations that synchronous DRAMs were not known in the prior art. In fact, synchronous DRAMs were known at least as

early as 1972. (*See* A10311.) In particular, the Intel 4002 was a RAM that was controlled by two external clock signals φ1 and φ2 and included "[i]nternal refresh circuitry [that] maintains data levels in the cells" (*i.e.*, was dynamic). (*See* 10311.) Furthermore, iRAM describes synchronous DRAM in 1985 (A10494-549) and Defendant's expert noted that "Early DRAM interfaces could be asynchronous or *synchronous,* unclocked or *clocked*." (A10583.)

### 2. Synchronous Memory Devices and Interleaved Transactions

Rambus also discusses how synchronous memory devices permit interleaved transactions even though interleaving transactions are not recited anywhere in the claims. (Rambus's Br. at 14.) To the extent such features are relevant, which they are not, there is no dispute that Bennett discloses them. First, Rambus cannot dispute that Bennett discloses a synchronous memory device. (A1451(101:50-54) ("The timing diagram of FIG. 52a firstly shows as reference the signals (H)φ1 and (H)φ2 to which all communication between the Versatile Bus Interface Logics and the User, and upon the Versatile Bus, is synchronously referenced"); A1420(40:52-55); A1418(35:59-62).)

Further, interleaved transactions are referred to in Bennett as pipelining where the bus may be used for other transactions during intervening cycles.

11

(A1410(19:28-33).)[4] In fact, the ability to perform interleaved transactions is one of the core objectives of Bennett. (A1410(19:28-33).) An example of Bennett's interleaved pipelined operations on a bus is shown in Figure 30, where the cycle between the beginning of transaction 1 and its completion is used to begin an additional transaction (*i.e.*, two outstanding requests). (A1443(85:5-6) (explaining that Figure 30 shows "three pipelined transactions"); *see also* A37 and A10021 (Respectively, the Board's and District Court's discussion of Bennett's memory transaction pipelining).)



**Bennett FIG. 30 (A1165)**

---

[4] In another appeal involving the Bennett reference, Rambus has asserted that Bennett's pipelining is not an interleaved transaction because data delivery for Transaction 1 does not need to be delayed to free up the bus for the Slave ID/Function of Transaction 2. However, that is not the definition of an interleaved transaction. As acknowledged in Rambus's Principal Brief, transactions are interleaved when a second transaction begins before a first transaction completes. (Rambus Br. at 14.) This is precisely what Bennett discloses.

Thus, neither a synchronous memory device nor interleaved memory transactions were novel at the time the '285 Patent was filed. In fact, both features are extensively disclosed by Bennett.

### 3. Memory Device Response Time in the '285 Patent

Throughout its arguments, Rambus relies on the premise that the access times disclosed in the '285 Patent specification are absolute in that write data is always sampled exactly when a certain number of clock cycles expires. (*E.g.*, Rambus's Br. at 17-19 and 55-56.) However, the specification of the '285 Patent repeatedly states that outputting data exactly at the expiration of the access time is merely a preferred implementation and not a necessary feature. For example, the '285 Patent specification states:

> Thus an access time value of '1' would indicate that the slave should not access the bus <u>until at least two cycles after</u> the last byte of the request packet has been received.

(A85(16:5-8).)

> In a preferred implementation, semiconductor devices connected to the bus contain registers 172 which specify the memory addresses contained within that device and access-time registers 173 which store a set of one or more delay times at which the device can <u>or should</u> be available to send or receive data.

(A80(6:34-39).)

> To reduce the complexity of the slaves [e.g., memory devices], a slave <u>should preferably respond</u> to a request in a specified time, sufficient to allow the slave to begin or possibly complete a device-internal phase

13

including any internal actions that must precede the subsequent bus access phase.

(A81(8:48-52).)

<u>In most cases</u>, a slave will respond at the selected access time by reading or writing data from or to the bus over bus lines BusData[0:7] and AddrValid will be at logical 0.

(A83(11:61-63).)

When viewed in light of the specification, it is clear that outputting data exactly when the access time transpires is only a preference and not a requirement. The specification shows that access time is at best a minimum time needed for the memory device to perform a transaction but that in other cases a memory device may not respond until some indeterminate number of clock cycles after the access time expires. (A85(15:63-16:8).)

Nor do claims 15 and 16 require that data be sampled *exactly* when a number of clock cycles transpire, as Rambus argues, because the claims only recite sampling data "after" a number of clock cycles transpires. Neither the ordinary meaning of "after" nor the specification requires the sampling of data to occur precisely when the number of clock cycles transpires as opposed to sampling data sometime "after" the number of clock cycles transpires. The claims certainly do

not preclude an intervening arbitration time.[5] Even if arbitration occurs, the data is

still sampled "after the amount of time transpires," which is all that claims 15 and

16 require.

### D. Summary of the Board Decision

In its Decision issued on April 24, 2012, the Board affirmed the examiner's

rejection of claim 13 as anticipated by Bennett and reversed the examiner's

decision withdrawing the rejection of claims 15 and 16 as anticipated by Bennett.

(A47.) The Board addressed Rambus's contention concerning Micron's standing

and determined that Rambus failed to provide persuasive authority to support its

standing challenge. (A32-33.) The Board held that Micron had standing to appeal

any final decision that was favorable to patentability. (A32-33.)

The Board made numerous findings of fact to support its finding that claims

13, 15, and 16 are anticipated by Bennett. (A34-38.) For instance, the Board found

"Figure 36 represents pin and timing for a write operation to a large memory

device with a 4315335 protocol 'configuration' and "Figures 25a-h, represent more

generic slave device configuration," which include memory slave devices. (A34-

---

[5] "Arbitration" refers to a process by which a user, such as memory, competes with other users for access to the bus. Bennett also states that certain configuration do not use arbitration. (A1435(69:31-35))

35(¶B2); A18.) Of importance to this appeal is the Board's following finding of

fact:

> B5. Figures 25a-h, described in section 3 of Bennett, depict timing diagrams for slave devices on the VLSIC bus which have eight configuration parameter digits (e.g., 122123XX) for the devices. (*See* col. 86, 11. 31-32.) For these figures, and for preferred embodiments, Bennett discloses only two choices (i.e., either digit 1 or 3) for the sixth configuration parameter which specifies the number of wait lines between chips transferring data. (*See* col. 86, ll. 31-41; 55-58; col. 83, ll. 30-40; col. 76, ll. 1-2 (preferred embodiments have zero or one wait line); col. 86, 1. 31- col. 87, 1.8 (only specifying configuration digits of either 1 or 3 for the sixth (VI) parameter in Figures 25a-h); col. 86, ll. 55-67 (explaining that wait nullity 2 "should not be used"); *compare* Figure 3 (generally allowing for configuration digits 1, 2, 3, 4, or 5 for the sixth parameter). The digit 1 signifies that the wait function is pin multiplexed (Mpx) on data lines while the digit 3 signifies one designated wait line. (*See* Fig. 3; col 86, ll. 31-48.)

> These parameter configuration digits, 1 and 3, indirectly dictate a relative number of clock cycles which transpire after a function signal: "Data transfers begin after Wait if multiplexed, or simultaneously with Wait if pipelined ...." (Col. 77, ll. 40-41.) (The "pipeline" refers to transferring the wait signal to its own designated pin so that waiting, otherwise required with multiplexing over the same lines, is not required.)

> Thus, relative to the write command (i.e., the ID/FUNCTION of Figs. 25a-h), the sixth configuration digit 1 corresponds to an extra clock cycle, based on multiplexing, as compared to the total clock cycle number corresponding to the sixth configuration digit 3. This extra clock cycle which occurs every time the sixth digit is 1 in Figures 25a-h, amounts to four total clock cycles, or two clock cycles after a function command such as write (i.e., the ID/FUNCTION command). On the other hand, every time the sixth digit is 3 in Figures 25a-h, the delay amounts to three total clock cycles, or one clock cycle after the

16

write command (i.e., ID/FUNCTION command). (*Compare* Figure 25a, c, e, and g *with* Figures 25b, d, f, and h). (A36-37(¶B5).)

The Board determined that Bennett discloses a programmable configuration register with the value 1 (signifying multiplexing of the wait line) or 3 (signifying a dedicated wait line). (A39-40.) The Board continued, "the configuration value represents the number of wait lines which itself represents a change in the number of clock cycles before data can be sampled" thus, satisfying "storing a value which is representative of the programmable number of clock cycles" recited in claim 15. (A42.) Given Bennett's disclosure, the Board found for all configurations depicted in Figures 25a-h, the programmed number 1 indicates a total of two clock cycles transpire before sampling data after a write request, while the programmed number 3 indicates a one clock cycle transpires before sampling data after a write request. (A43.)

The Board also addressed Micron's arguments that claims 13, 15, and 16 were not entitled to the filing date of the '898 application because the '898 application does not provide written description support for a memory device that does not interface to a multiplexed bus. The Board determined that the '285 patent was entitled to a priority date of April 18, 1990. (A45-47.) Thus, the Board refused to consider JEDEC or Park.

## IV.   **SUMMARY OF THE ARGUMENT**

Rambus argues Micron does not have standing to appeal issues that were not included in Micron's original request for reexamination. However, the Board correctly determined that Micron has a statutory right to appeal any final decision favorable to patentability, including a right to appeal the examiner's findings that claims 15 and 16 were not anticipated by Bennett. *See* 35 U.S.C. §§ 315(b) and 134(c); (A2084-85.)

Rambus also argues that the Board erred in finding that Bennett anticipates claims 15 and 16 of the '285 Patent because (1) the Board allegedly misconstrued the term "representative" in the limitation "a value which is representative of the programmable number of clock cycles" recited in claim 15, and (2) the Board's factual findings lack substantial evidence. (Rambus's Br. at 54 and 58.) However, the Board found Bennett anticipates under Rambus's construction. Substantial evidence supports the Board's finding that the sixth parameter of Bennett's configuration register represents a programmable number of clock cycles under either Rambus's proposed construction or a construction more consistent with the specification of the '285 patent. (A43.)

Nevertheless, the Board erred in determining that claims 15 and 16 had priority to the April 18, 1990 filing date of the '898 application because the '898

application does not provide written description support for a memory device that does not interface to a multiplexed bus. (A44-47.)

## V. <u>ARGUMENT</u>

### A. Standards of Review

Rambus has the burden to show that the Board committed reversible error. *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004).

"When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails in the absence of clearly expressed legislative intent to the contrary." *In re Donaldson Co.*, 16 F.3d 1189, 1192–93 (Fed. Cir. 1994) (en banc). This Court gives deference to an agency's permissible construction of an ambiguous statute. *Cooper Technologies Co. v. Dudas*, 536 F.3d 1330, 1337-38 (Fed. Cir. 2008) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, Inc., 467 U.S. 837, 844 (1984)). This deference extends to an agency's interpretation of a jurisdictional provision of a statute it administers. *City of Arlington, Texas v. F.C.C.*, 133 S. Ct. 1863, 1874 (2013). Finally, this Court affords substantial deference to the PTO's interpretation of its own regulations unless that interpretation is plainly erroneous or inconsistent with the regulation in situations of ambiguity. *In re Lovin*, 652 F.3d 1349, 1353 (Fed. Cir. 2011).

Anticipation is a question of fact. *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991). What a reference teaches is a question of fact. *Para-*

*Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995). This Court upholds the Board's factual findings unless those findings are not supported by substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). Substantial evidence "is something less than the weight of the evidence but more than a mere scintilla of evidence," *In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000), and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

Further, if "the evidence in [the] record will support several reasonable but contradictory conclusions," then this Court "will not find the Board's decision unsupported by substantial evidence simply because the Board chose one conclusion over another plausible alternative." *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Board's finding from being supported by substantial evidence." *Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1361 (Fed. Cir. 2001).

Claim construction is a question of law that this Court reviews *de novo*. *In re NTP, Inc.*, 654 F.3d 1268, 1274 (Fed. Cir. 2011) (citing *In re Baker Hughes, Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000)). During reexamination proceedings, claims are given their broadest reasonable interpretation consistent with the specification.

*In re Yamamoto*, 740 F.2d 1569, 1571-72 (Fed. Cir. 1984); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).

## B. The Board Correctly Determined that Micron Has Standing to Appeal

The Board considered the *inter partes* reexamination statute and the Patent Office rules and determined that Micron had standing for its appeal to the Board. (A32-33; A2084; A20021-22). In short, the Board determined based on the language of the statute and the rules that Micron could appeal any final decision favorable to patentability in the examiner's final decision even if the issue was first raised by Samsung. (A32; A20021).

As stated by Rambus, the statutory right of a requester to participate in *inter partes* reexamination appeals is governed by 35 U.S.C. § 315(b) (2002). However, contrary to Rambus's assertion, nothing in the statutory language limits a requester's rights in the manner suggested by Rambus.

### 1. Patent Office's Interpretation Should be Given *Chevron* Deference

While § 315(b) is clear on its face that a requester can appeal "any final decision favorable to the patentability of any original or proposed amended or new claim of the patent" regardless of whether the issue was raised in requester's reexamination request, in the event this Court finds the statute to be ambiguous then the Patent Office's interpretation of § 315(b) should be given deference as it relates to the conduct of proceedings before the Office. *Cooper Techs. Co. v.*

21

*Dudas,* 536 F.3d 1330, 1335 (Fed.Cir. 2008)("Because the Patent Office is specifically charged with administering statutory provisions relating to 'the conduct of proceedings in the Office,' 35 U.S.C. § 2(a)(2)(A), we give *Chevron* deference to its interpretations of those provisions.")(*referencing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

In fact, in a case involving a dispute of the Patent Office's interpretation of another *inter partes* reexamination statutory provision, this Court has already indicated the Patent Office would be entitled to deference. *Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 646 (Fed. Cir. 2011)("While we believe that [35 U.S.C.] § 317(b) is clear, even if it were ambiguous, the Patent Office's interpretation that § 317(b) does not apply '[i]f there remains any time for an appeal' would be entitled to deference").

The Supreme Court has confirmed this deference extends to "cases in which an agency adopts a construction of a jurisdictional provision of a statute it administers." *City of Arlington, Texas v. F.C.C.*, 133 S. Ct. 1863, 1873 (2013). In *City of Arlington*, the Supreme Court determined that the FCC's jurisdictional statutory interpretation was entitled to deference because "Congress has unambiguously vested the FCC with general authority to administer the Communications Act through rulemaking and adjudication, and the agency interpretation at issue was promulgated in the exercise of that authority." *Id*. at

22

1865. Likewise, in this case Congress has unambiguously vested the Patent Office with general authority to conduct proceedings before it (35 U.S.C. § 2(b)(2)(A)) and the statutory interpretation of 35 U.S.C. § 315(b) (2002) was made in the exercise of that authority. Thus, *City of Arlington* confirms that the Board's interpretation of its own jurisdiction in this instance is entitled to *Chevron* deference.

Rambus's assertion that "Congress has spoken directly to the jurisdiction issue and *made clear* that a party may appeal to the Board *only* issues that *it raised in its own* reexamination request" is patently false and contradictory of the language in § 315(b). (*See* Rambus's Brief at 47.) Yet, Rambus does not point to any legislative history at all, let alone any legislative history that would indicate that Congress intended to limit requesters' appeal rights only to issues raised in their reexamination requests. Nor does the language of §315(b) state that appeals are restricted only to issues raised in a reexamination request. In fact, the statute expressly provides for appeals of "amended or new claims," which can be added during the reexamination proceeding and thus may only come into existence after the reexamination request is filed.

In this case, the issue involves the interpretation § 315(b), which is related to the conduct of appeal proceedings in *inter partes* reexaminations before the Patent Office. The Patent Office's interpretation of the statute and its regulations, as

23

incorporated in its decisions regarding Micron's appeal, should be given *Chevron* deference.

### 2. 35 U.S.C. § 315 Does Not Limit Appeal Rights to the Third Party Requester Who Initially Proposed the Rejection

Rambus dedicates much of its brief to arguing that the PTO's decision to merge the Samsung and Micron reexaminations confers new statutory rights on Micron. (Rambus Br. at 38.) The persistent flaw in Rambus's argument is that it bases a requester's statutory appeal rights solely on what is in a requester's reexamination request rather than basing the appeal rights on the examiner's final decision of patentability, as required by the statute. 35 U.S.C. § 315(b) ("A third-party requester – (1) may appeal…with respect to any final decision favorable to the patentability" of a claim of the patent).

As noted by the Board, "the Examiner considered all grounds of rejection proposed by both Requesters … Micron's appeal of issues originally proposed by Samsung, is an appeal of the Examiner's position on those issues." (A20021.) Thus, Micron's appeal to the Board was an appeal of the examiner's final decision finding the claims patentable as expressly permitted by statute. (A4-5 and A32-33; *see also* A2084 ("[a]s the Board repeatedly has held, the origin of a patentability issue is immaterial to a requester's right to raise the issue on appeal").)

Indeed, when this Court considered § 315(b) in another case, it looked to the issues raised in the examiner's ACP, RAN, and the Examiner's Answer to

24

determine what issues the requester could appeal. *Belkin v Kappos*, 696 F.3d 1379, 1384 (Fed. Cir. 2012). The Court specifically denied the requester's argument in that case that the requester should be able to appeal issues raised in its request for reexamination but not included in the final decision of patentability. *Id.* at 1385. Thus, the Board's decision to determine a requester's appeal rights based on the examiner's final decision rather than on what is contained in a requester's reexamination request is consistent with this Court's precedent.

Rambus's argument that § 315(b) only confers appeal rights "in the *particular reexamination* that the third party actually requested" fails to address the fact that the rejections originally proposed by Samsung were included in the office actions in Micron's particular reexamination proceeding. (Rambus's Br. at 39) (emphasis in original). The examiner mailed the same Office Action in Micron's reexamination proceeding (assigned Control Number 95/001,131) and Samsung's reexamination proceeding (assigned Control Number 95/001,106). (A10553-554.) Thus, the issues raised by Samsung were included by the examiner in Micron's proceeding and vice versa.

Rambus also argues that it would be absurd to interpret "any" as used in §315(b) broadly enough to include unrelated reexaminations involving unrelated patents. (Rambus's Br. at 39-40.) Rambus then argues that "any" would necessarily have to be interpreted just as broadly elsewhere in the statute.

(Rambus's Br. at 39-40 (referencing 35 U.S.C. § 314)).) Yet, these "absurd" hypotheticals have no relevance to the current issue because the Office has not interpreted "any" to be as broad as Rambus suggests.

### 3. Rambus's Hypothetical Non-Merger Scenario Is Irrelevant

Rambus further spends a significant portion of its Brief discussing Micron's right to appeal under an irrelevant hypothetical scenario that assumes a merger did not occur. (Rambus's Br. at 41-46.) Because a merger did in fact occur, Rambus's hypothetical does not have any relevance to the current proceeding.[6]

Notwithstanding the above, Rambus argues that in the scenario where there is no merger, Micron would not have had a right to appeal a rejection initially proposed by Samsung. (Rambus's Br. at 41-43.) Rambus's hypothetical scenario, however, is based on the flawed premise that the Patent Office would rely on separate and distinct prior art rejections in contemporaneous Office Actions against the same claims of the same patent in co-pending *inter partes* reexaminations. The reality is that even if the proceedings were not officially merged, the examiner could *sua sponte* add rejections from each proceeding into the other.

---

[6] Moreover, during the underlying proceedings Rambus never contested the Office's merger decision or Micron's commenting on all of the issues in the Office Actions, including those originally raised in Samsung's reexamination request. It was not until Micron appealed the examiner's final decision that Rambus raised this issue. Thus, any reliance by Rambus on an improper merger has been waived.

Under Rambus's hypothetical scenario, the examiner would issue two different Office Actions based on the respective prior art in each reexamination request. (Rambus Br. at 41.) Yet, this would have confused and complicated the interlinked issues, such as the claim interpretation, as well as increased the administrative burden on the Office. In explaining the reasoning underlying merger, the Office stated that merger helps solve numerous problems:

> The general policy of the Office is that two reexamination proceedings will not be conducted separately, and at the same time, as to a particular patent. The rationale for this policy is (1) to prevent inconsistent, and possibly conflicting, amendments from being introduced into the two proceedings on behalf of the patent owner, (2) to provide a comprehensive examination of the patent based on the issues raised in both of the proceedings, and (3) to expedite the prosecution of both proceedings.

(A1694.) Rather than a consistent, comprehensive, and expedited proceeding, Rambus's hypothetical assumes that the Office would prefer to have the opposite. Yet, the Office's merger policy is not in place for the benefit of Rambus (or Micron), but instead for the benefit of the Office itself. As such, even in un-merged *inter partes* reexamination proceedings, the Office would be likely to issue identical Office Actions in each proceeding in order to obtain many of the same benefits of merger.

Next, Rambus asserts that the Office's merger proceeding cannot confer statutory rights on Micron as such would be akin to substantive rulemaking.

(Rambus's Br. at 43.) That argument is misguided because the merger did not confer any special appeal rights on Micron in this proceeding. Instead, Micron had appeal rights to the Board because the examiner issued a final decision favorable to patentability with respect to the proposed rejection of claims 15 and 16 over Bennett (and other prior art). *See* 35 U.S.C. § 315(b) and 37 C.F.R. § 41.61(a)(2).

Furthermore, Rambus fails to explain how the Board's interpretation of §315(b) can result in a new substantive rule. To the extent the Office's rules on appeal are applicable, the rules here are merely procedural rules that determine what issues a party in an *inter partes* reexamination may appeal. Rambus was given the opportunity to fully participate in and address all arguments on appeal before the Board. Even if a procedural rule has some effect on the rights of the parties, that alone does not change a procedural rule to a substantive rule. *See Hanna v. Plumer*, 380 U.S. 460, 464-65 (1965) ("Undoubtedly most alterations of the rules of practice and procedure may and often do affect the rights of litigants."); *see also JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (quoting *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 900 F.2d 369, 383 (D.C. Cir. 1990) (Silberman, J., dissenting)) ("[o]f course, procedure impacts on outcomes and thus can virtually always be described as affecting substance").

Rambus's attempt to analogize a reexamination merger procedure to district court consolidation lacks any relevance. Rambus fails to explain how or why these

28

procedures should be treated as equivalents of each other. The statutes, rules, and procedures that define an *inter partes* reexamination proceeding are materially different and have no direct corollary to the statutes, rules, and procedures that define a district court action.

Lastly, Rambus tries to show that the Office has issued conflicting decisions related to appeal rights. (Rambus Br. at 45.) Rambus, however, fails to explain how a prior Board decision that was expressly reversed can be the basis for a conflicting decision.

> The Office has addressed this issue on several occasions within the past few months. *With the exception of one early decision that was grounded on an improper interpretation of MPEP § 2674 that subsequently has been reversed*, the Office consistently has held that Micron has the right to appeal any decision favorable to patentability that is present in a merged proceeding at the time the RAN is entered irrespective of who initially raised the patentability issue in question.

(A20005).

Rambus's citation to a merger order in other parties' unrelated reexaminations is equally unavailing. (Rambus Br. at 46.) The cited merger order was not at issue in this proceeding and it does not alter the decision of the Board in this case or the rights granted by 35 U.S.C. § 315(b). To the extent it is considered, the merger order merely states that a requester's rights are "confined by the statute" which is consistent with the Board's decision finding the statute provided Micron the right to appeal. (Rambus Br. at 46.)

Micron simply took advantage of its explicit statutory right to appeal any final decision in favor of patentability. Rambus never contends, nor can it, that it is impermissible for an examiner to issue a rejection in reexamination that was not included in a requester's request for reexamination. *Belkin,* 696 F.3d at 1383 ("Inter partes reexamination is not totally limited to those issues suggested by the requester that present a substantial new question of patentability. Indeed, the PTO may make any new rejection ...").

Rambus has not shown that the Patent Office has instituted any substantive rule making. The Board simply interpreted procedural statutes and rules to confirm that Micron had standing to appeal and participate in the appeal of this proceeding.

### 4. Filing an Appeal Brief Does Not Constitute Filing Simultaneous *Inter Partes* Reexaminations of the Same Patent

Rambus also argues that 35 U.S.C. § 317(a) (2002) supports its argument that Micron cannot appeal rejections proposed by another requester because §317(a) prohibits a requester from filing subsequent *inter partes* reexaminations. However, 35 U.S.C. § 317(a) is inapplicable because Micron has not filed a second *inter partes* reexamination request.

Rather than remain confined to the clear statutory language directed to a prohibition against "filing subsequent requests for *inter partes* reexamination," Rambus contends that the statute should be interpreted more broadly to prohibit "participat[ion] in more than one *inter partes* reexamination of a patent at a time."

30

(Rambus's Br. at 49.) Yet, Rambus does not even attempt to provide analysis for how it arrived at such a novel interpretation of the statute.

Rambus fails to address that the Board has already considered 35 U.S.C. § 317(a) and determined that it does not bar Micron's participation in the appeals. (A5.) To the extent the statutory language is ambiguous, the PTO's interpretation of 35 U.S.C. § 317(a) should be given deference just as this Court found for the PTO's interpretation of 35 U.S.C. § 317(b). *Bettcher Indus*, 661 F.3d at 646 ("While we believe that [35 U.S.C.] § 317(b) is clear, even if it were ambiguous, the Patent Office's interpretation that § 317(b) does not apply "[i]f there remains any time for an appeal" would be entitled to deference").

### 5. The Board's Decision Invalidating Certain Claims Cannot Be Moot

Notably, it appears that the crux of Rambus's argument is that by settling with Samsung, Rambus should get the benefit of an erroneous patentability decision by an examiner, which was overturned by the Board, simply because Samsung filed its *inter partes* reexamination request before Micron.[7]

Rambus disregards the fact that this appeal does not depend wholly on Micron's Board appeal because the Board, and ultimately the Director, can review

---

[7] This is contrary to the express purpose of *inter partes* reexamination espoused in the legislative history, namely, to provide an alternate forum for third parties to fully argue their case. *See* American Inventors Protection Act of 1999, Extension of Remarks, House of Representatives, 12 Cong. Rec. E1789 (Hon. Howard Coble, Aug. 5, 1999).

an examiner's confirmation of patentable claims on their own and issue new grounds of rejection. *Belkin,* 696 F.3d at 1383 ("Indeed, the PTO may make any new rejection, as long as that rejection also meets the substantial new question of patentability requirement. *See* 35 U.S.C. § 303(a) ('On his own initiative, and any time, the Director may determine whether a substantial new question of patentability is raised by patents and publications discovered by him …')").

Thus, contrary to Rambus's assertion (Rambus's Br. at 50-51), the Office has the authority to issue the rejection even in Micron's absence, and likely would do so in order to prevent issuance of patent claims the Board has found to be unpatentable over known prior art. 37 C.F.R. § 41.77(b) and *Ex parte Pactiv Corp.*, BPAI Appeal No. 2008-5125, 2009 WL 742669 at *11-12 (March 20, 2009) (*citing Keystone Bridge Co. v. Phoenix Iron Co.*, 95 U.S. 274, 278 (1877)).

## C. The Board Correctly Determined, Based on Substantial Evidence, That Bennett Discloses a Value Which Is "Representative of the Programmable Number of Clock Cycles"

### 1. The Board Correctly Interpreted "Representative"

Rambus first argues that in order to be "representative," "a value 'must be directly related to and stand for, or be reasonable proxy for, the latter item.'" (Rambus's Br. at 54 (citing *Tehrani v Hamilton Med., Inc.,* 331 F.3d 1355, 1361

(Fed. Circ. 2003)).)[8] While Rambus couches this argument solely as a claim construction issue, it should be noted that the Board found that Bennett anticipates even using the construction of "representative" from *Tehrani* as urged by Rambus. The Board held "in all the configurations for the Figure 25a-h embodiment, the number 1 <u>always results</u> in a two clock cycle delay for 'DATA' after a write request, and the programmable number 3 <u>always results</u> in a one clock delay for 'DATA after a write request." (A43(emphasis added).) The Board noted that Rambus did not dispute this finding. (A18.)[9] Thus, the finding that Figure 25a-h of Bennett anticipate claims 15 and 16 under the construction argued for by Rambus should be reviewed for substantial evidence.

Rambus's only response to Figures 25a-h is that the Board improperly relied on "the hypothetical effect of two 'simplified' transactions" as represented in Figures 25a and 25b. (Rambus's Br at 56-57.) Rambus's argument, however, is

---

[8] As an initial matter, Rambus's reliance on *Tehrani* is misplaced, as *Tehrani* was decided under the now repudiated *Texas Digital* principles of claim construction. *Tehrani* 331 F.3d at 1361 (citing *Tex. Digital Sys., Inc. v. Telegenix, Inc.* 308 F.3d 1193, 1203 (Fed. Cir. 2002)). The meaning that "representative" had in *Tehrani* is of little, if any, value in determining how the term should now be construed for the '285 Patent.

[9] In another proceeding involving the Bennett reference, the Board held "Bennett's parameters VI, VII, and VIII not only represent the delay time…, they *dictate* that time…in a direct manner." (A10692(emphasis in original).) Moreover, the Board expressly held: "Bennett's configuration parameter values represent, 'symbolize,' or 'stand for,'…the delay time…since they dictate that time." (A1093(citing *Tehrani,* 331 F.3d at 1361).)

undercut by the factual findings of both the Board and the District Court in California, both of which found that Figures 25a and 25b represent transactions of a "memory device." (A16(holding "Rambus faults the Decision['s] similar finding that Figures 25a-h generally apply to generic slave memory chip devices. But Bennett's teachings are directed toward memory chips..."); A10022 (District Court stating "in Figure 25a, there is a delay of 1 clock cycle between the memory device receiving the request for a write operation and the memory device receiving data. In Figure 25b, there is no delay").)

To the extent this Court finds that the Board relied on a broader construction of "representative" than advocated by Rambus, such construction was based on the usage of "representative" in the '285 Patent. (A19-20; *compare Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)("During patent examination, the pending claims must be 'given their broadest reasonable interpretation *consistent with the specification.*'")(emphasis added).) As the Board determined, the '285 Patent relies on encoding schemes so that the same value stored in a register "represents" multiple different numbers depending on which encoding scheme is selected. (A19-20.) As an example, the '285 Patent discloses the 3-bit pattern of 011 can "represent[]" block sizes of 3 or 64 depending on what encoding scheme is selected by a separate parameter. (A83(11:38-58).)

In another appeal involving Bennett, Rambus has argued that the block size is represented by a 4-bit pattern comprised of "BlockSize[0:3]," where the pattern 0011 (binary value of 3) represents 3 and the pattern 1011 (binary value of 11) represents 64. Yet, Rambus fails to explain how the disclosed system knows that in one case 3=3 and in the other case that 11=64. The answer is that the first bit of "BlockSize[0:3]" selects an encoding scheme and is not part of the value representative of block size. The '285 patent specifically states that it is the three "remaining bits" that are the "representation of the block size."

> BlockSize[0:3] specifies the size of the data block transfer. If BlockSize[0] is 0, *the remaining bits are the binary representation of the block size* (0-7). If Blocksize[0] is 1, then *the remaining bits give the block size as a binary power of 2*, from 8 to 1024.)

(A83(11:39-58))

Thus, in the '285 Patent, the number "represent[ed]" by a 3-bit pattern can change depending on the value of other configuration parameters. This is no different than Bennett, where the time to transpire represented by the 3-bits of configuration parameter VI may change depending on the value of other configuration parameters. For example, in Rambus's example for Figure 36 of Bennett (Rambus Br. at 62) the 3-bit pattern of 011 for Parameter VI can represents 1, 2 or 4 clock cycles depending on the other configuration values.

Even Rambus concedes that the actual number of clock cycles to transpire need not be stored in a register so long as a value representing the number of clock cycles is stored. (Rambus's Br. at 55 ("the access-time register stores actual number of clock cycles (*or values representing them*), corresponding to the actual 'timing of the response' of a given memory device.")(emphasis altered from original)(referencing A82(9:58-59).)

As demonstrated above, Rambus has not shown that the Board erred in determining that Bennett anticipates "a value which is representative of the programmable number of clock cycles of the external clock in a programmable register on the memory device" as recited in claim 15 of the '285 Patent. The configurations shown in Figures 25a and 25b of Bennett are substantial evidence relied on by the Board in determining that Bennett anticipates the claims, even under Rambus's construction of "representative" (where the stored value must always correspond to the same number of clock cycles even when other configuration parameters change). In addition, the Board's decision is indisputably supported by substantial evidence under the proper construction of "representative" in light of the specification of the '285 patent (where the stored value may represent different numbers in different configurations).

## 2. The Board's Findings Are Supported by Substantial Evidence

Rambus argues that "[t]he Board did not rebut the examiner's finding that the same wait-line setting of 3 in configuration value VI of Bennett 'causes different delays' in the transactions illustrated in Figures 25*b*, 35, and 36." (Rambus's Br. at 58 (citing A40).) Rambus's argument is flawed on several grounds. First, the Board is not required to "rebut the examiner's findings" as Rambus demands. "[T]he Board's primary role is to review adverse decisions of examiners including the findings and conclusions made by the examiner." *Ex parte Frye*, 94 USPQ2d 1072, 1077 (BPAI 2010) (precedential); *see also* 35 U.S.C. § 6(b) (2002).[10] "Specifically, the Board reviews the particular finding(s) contested by an appellant *anew* in light of all the evidence and argument on that issue." *Frye*, 94 USPQ2d at 1075. The Board does, of course, "necessarily weigh all of the *evidence and argument*" when it is reviewing findings of the examiner anew. *Id.* (emphasis in original)(quoting *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992)).

Under the PTO's review procedures, no deference should be given to the examiner with respect to determinations of fact or law. The former PTO director

---

[10] The current version of § 6(b) (P.L. 112-283, Sept. 16, 2012, approved 1-15-13) enumerates the Board's duties.

has explained the PTO's review procedures in light of the decision in *Frye*:[11] "This means that the Board does not give deference to positions taken by the examiner when considering an appellant's argument specifically challenging the examiner's findings." (http://www.uspto.gov/blog/director/entry/ex_parte_frye_bpai_s.) The Director's reasoning is supported by this Court's case law as well. *See In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003)("examiners *and administrative patent judges on the Board* are responsible for making findings…as to the meaning of prior art references to persons of ordinary skill in the art and the motivation those references would provide to such persons") (emphasis added).

Indeed, in reversing the examiner's determination, 37 C.F.R. § 41.77(a) requires only that the Board provide an opinion in support of its decision, but does not require the Board to detail the error in the examiner's findings. Therefore, neither the statute nor the rule requires the Board to explain error in the examiner's underlying findings in order to draw a different conclusion. Moreover, 37 C.F.R. § 41.77(b) provides that the Board may issue a new ground of rejection "should the Board have knowledge of any grounds not raised in the appeal for rejecting any pending claim…." Therefore, the Board can issue a new rejection based on its own factual findings even without reliance on factual findings of an examiner.

---

[11] *Ex parte Frye* was decided in part by former Director Kappos.

Here, the Board reviewed the parties' arguments and the examiner's position for withdrawing the grounds of rejection. As discussed herein, the Board found error in the examiner's position and, contrary to Rambus's argument, provided the reason for finding error. (*See, e.g.,* A42-43.) The Board provided its relevant findings of fact, legal authority, and analysis necessary to address the issue of whether claims 15 and 16 are anticipated in light of the prior art.

Next, even assuming the examiner's findings should be accorded some amount of deference, which they should not, the examiner nevertheless incorrectly found that the same wait-line setting of 3 in parameter VI causes different delays in the transactions illustrated in Figures 25b, 35, and 36. Rambus argues that "in the transactions illustrated in Figures 25*b* and 36, there are two different sampling times, despite configuration parameter VI being set to '3' in both cases." (Rambus's Br. at 60.) However, Rambus ignores that if configuration parameter VI of either Figures 25b or 36 were changed from 3 to 1, then the data would be provided *one clock cycle later*. (A20-21.) Thus, there can be no dispute that a setting of 1 in parameter VI for Figures 25b and 36 represents *one extra clock cycle delay*.

Rambus's argument is that masters in Bennett do not know the actual response timing of the slave memory devices and that, therefore, a delay of one clock cycle does not disclose the total number of clock cycles. (Rambus Br. at 57

("simply knowing that a multiplexed wait line will result in X+1 clock cycles instead of X clock cycles says nothing as to what X is").) That argument contradicts the explicit disclosure in Bennett and the Board's factual findings that Bennett's communication protocol defines when data is transmitted (i.e., that the X in Rambus's example is known). (A20 fn.8 (quoting A1420(39:31-32)).) In fact, Rambus implicitly acknowledges fact when it was able to determine the total number of clock cycles that would transpire for different configurations of Figure 36. (Rambus's Br. at 62 (noting that 1, 2 or 4 clock cycles transpire depending on changes to certain configuration parameters).) Even without such disclosure, Rambus's argument is legally improper because it presumes that Bennett is inoperable as Bennett's interconnect system could not operate without knowledge of the timing of transactions, including memory transactions. *In re Sasse*, 629 F.2d 675, 681-82 (CCPA 1980)(prior art is presumed enabled and operable).

Notwithstanding Rambus's assertion to the contrary, the exact change in the total number of clock cycles to transpire when parameter VI is changed from 3 to 1 in both Figures 25b and 36 is easily determined and definitively known by Bennett's communication protocol. Regarding Figure 25b, using configuration 122123XX, the number of clock cycles between receipt of the operation code and transfer of data is one. (A1160.) If parameter VI in Figure 25b is changed from 3 to

40

1, and all other configuration parameters are held constant, the number of clock cycles increases to two. (A1160.)

Similarly, regarding Figure 36, using configuration 43153355, the number of clock cycles between receipt of the operation code and transfer of data is one. (A1170.) If parameter VI is changed to 1, and all other configuration parameters are held constant, the number of clock cycles increases to two. This is because multiplexing the Wait signal (abbreviated WT in Figure 36) would tie up the bus for an additional clock cycle before transmission on the data pins could begin. That these embodiments read on the claim is sufficient to show anticipation, even if other embodiments do not. *ArthroCare*, 406 F.3d at 1372 (only one embodiment needs to anticipate the claim).

Next, Rambus attempts to argue the Board's reliance on Figures 25a-h is insufficient because "it ignores [] other transactions in other bus configurations within Bennett's preferred 'envelope,'" namely Figure 36. (Rambus's Br. at 60.) Rambus, however, fails to acknowledge that the Board specifically considered Figure 36 in its finding that Bennett anticipates claims 15 and 16. (A20) Specifically, the Board determined that parameter VI controlled the number of clock cycles to transpire in Figure 36 just as it did in Figure 25. Thus, within either embodiment parameter VI is a programmable value that is representative of programmable number of clock cycles.

41

In an attempt to rebut the fact that Figures 25a and 25b alone anticipate the claim, Rambus asserts that Figures 25a and 25b are presented "in an artificial manner in order to 'simplify' their presentation." (Rambus's Br. at 61.) Yet, nowhere does Bennett describe these transactions as hypothetical. Just as with the other figures, Figures 25a and 25b are provided as examples to help one understand the disclosure of Bennett. That Bennett would provide simple examples first only makes logical sense before providing the more complex examples found later in Bennett's disclosure. Bennett even instructs the reader to "reference FIGS. 25a-25h" in understanding the effect of the configuration parameters on transaction timing. (A1409(17:32-29).)

In fact, just as the Board dismissed this argument from Rambus (A16), so did the District Court:

> Rambus also suggests that the description of Figures 25a and 25b are purely exemplary and that there is no guarantee that there is a one cycle delay between the request for a write operation and the output of data. Rambus bases this argument on Bennett's statement that "[i]n order to simplify presentation of timing concepts all Arbitration, Slave Identification/Function, and Data activities are assumed to be but one cycle." Bennett, col. 85, ll. 17-19. Rambus's argument fails for two reasons. First, this is not a baseless assumption by the Bennett inventors. The other primitives in the Figure 25 example are selected to ensure that arbitration, slave ID/function, and data all occur in one cycle. In other words, this is not a guess; there is a configuration of the Versatile Bus interface in which this is true. Second, it is irrelevant. That the arbitration, slave ID/function, and data activities are all assumed to last one cycle does not impact the amount of delay

42

between the slave ID/function and data activities. That delay is determined by the status of the wait signal. (A10024.)

There is nothing in Bennett indicating that the examples shown in Figures 25a and 25b would not operate within Bennett as Rambus contends. Bennett discloses just the opposite, as the configuration values given for Figures 25a and 25b are all within the preferred embodiment of the configuration values shown in Figure 3. (A1419.) Even Rambus admits that "[e]ach of these configurations…is within the preferred 'envelope' outlined in Figure 3 and is fully compatible with that preferred configuration." (Rambus's Br. at 59.)

Despite acknowledging that Figures 25a and 25b disclose an additional one clock cycle delay (Rambus's Br. at 31), Rambus argues that parameter VI cannot be "representative" of an amount to transpire because it merely specifies the number of wait lines and has "nothing to do with the concept of predetermined delay times." (Rambus's Br. at 55.) However, the purpose of the Wait signal is not relevant for anticipation. *Toshiba Corp. v. Imation Corp.,* 681 F.3d 1358, 1367-68 (Fed. Cir. 2012)(overturning a claim construction that improperly read a purpose requirement into a limitation reciting "identifying information *represents* the number of recording planes"). Just as in *Toshiba*, the claims here recite structural elements and, therefore, the purpose of Bennett's configuration parameter VI is

irrelevant since configuration parameter VI discloses the same structure of the value stored in a programmable register recited in claims 15 and 16.

Rambus continues: "[i]n an actual memory transaction, however, these 'simplified' assumptions are not always true," because arbitration and other variables must be considered. (Rambus's Br. at 62-63.) However, this statement by Rambus impliedly admits that in some situations the simplified transactions are true, such as the configurations that do not require arbitration. (A1466(94:28-32) and A1435(69:30-35) ("(By convention, *when any of these activities is not used* in a particular Versatile Bus configuration, we say that it is degenerate and takes no time and no pins to implement.) They are *Arbitration*, Slave Identification/Function, Wait, and Data.")

In one lengthy example, Rambus argues "the example shown in Figure 36 is 32-bits" and "consumes *two* clock cycles on the 16-bit data lines." Rambus continues: "However, if the bus were configured with less than 16 data lines, such as eight…then *four* clock cycles, not two, would elapse between the request and the data sampling. Conversely, if the address were only 16-bits in the Figure 36 configuration, then only *one* clock cycle would transpire prior to data sampling." (Rambus's Br. at 62.) Rambus makes this statement to argue that the total number of clock cycles may change based on other configuration parameters even when parameter VI remains the same and thus parameter VI is not "representative."

Nevertheless, as explained above, the '285 patent uses the same 3-bit value of 011 to "represent[]" both 3 and 64 depending on other configuration values. (A83 (11:39-58)) Similarly, in Rambus's example for Figure 36 of Bennett, the 3-bit value of 011 for Parameter VI represents 1, 2 or 4 clock cycles depending on the other configuration values. Instead, if the 3-bit value of 001 was used for Parameter VI, that value represents 2, 3 or 5 clock cycles respectively (as this change adds in a one clock cycle delay as discussed previously). Thus, even for Figure 36, Parameter VI is a programmable value stored in a configuration register "which is representative of the programmable number of clock cycles."

Micron has already addressed why the Board's claim construction was proper above. Nevertheless, even if this Court agrees with Rambus's claim construction, there is still no dispute that Figures 25a and 25b would anticipate the claim based on the findings by the Board. As the Board noted, "Rambus does not dispute this underlying rationale or the specific finding that in Figures 25a-h, the number 1 always results in a two clock cycle delay for DATA after a write request, and the programmable number 3 always results in a one clock delay for DATA after a write request." (A41-42.) Thus, at a minimum, Figures 25a and 25b provide a value which is "representative" of the number of clock cycles between a write request and the sampling of data as recited in claims 15 and 16.

Finally, the premise of Rambus's argument – that the same outcome must occur in every single one of Bennett's 30,000+ configurations in order to show anticipation – results in the fundamentally flawed conclusion that Bennett's vast disclosure would provide virtually no anticipatory disclosure due to its high configurability. Instead, as the Board has determined, at least some embodiments in Bennett's highly configurable system anticipate the claim, which is all that is legally required even if certain other configurations would not anticipate. *ArthroCare*, 406 F.3d at 1372.

### D. Alternatively, the Board Erred in Not Adopting the Anticipation Rejections Based on JEDEC and Park

Alternatively, in addition to the Bennett rejection discussed above, Park and JEDEC in view of Park render claims 15 and 16 obvious.[12] The Board and the examiner erred in determining that claims 15 and 16 are entitled to the earlier filing date of the '898 application, which was the only basis for not adopting Micron's proposed rejections based on JEDEC and Park. As Micron argued on appeal to the Board, claims 15 and 16 are not entitled to an earlier filing date because claims 15 and 16 are so different from the "invention" described in the specification of the original '898 application that the right of priority to those earlier applications was lost. (A1755-1765.)

---

[12] These same alternative grounds for affirmance apply as well to claim 13; however, Rambus has not appealed the PTO's rejection of that claim.

Claims 15 and 16 are not limited to the type of "bus" over which the memory device communicates with the rest of the system. The '898 parent application, to which the '285 Patent purports to claim priority, is explicit that the bus must be a "multiplexed" bus, where the various address, data, and control information is carried over the same plurality of bus lines, and is "multiplexed" so that the different information is carried at different times. Accordingly, Micron showed that because claims 15 and 16 broadly encompass any "bus" that would connect the memory to the rest of the system, those claims have no written description support in—and no priority to—the '898 parent application, which describes only a "multiplexed" bus for reading or writing data.

In rejecting Micron's arguments, the Board based its decision on its belief that the priority determination was controlled by the claim construction adopted by this Court in *Rambus Inc. v. Infineon Technologies Ag*, 318 F.3d 1081, 1094-95 (Fed. Cir. 2003). (A45-47.) That belief is incorrect. In a post-*Infineon* case involving priority issues as raised in this appeal, this Court stated: "*Though it would certainly be reasonable to conclude that Rambus's claims do not meet the written description requirement on the basis of ICU Med.*, that argument was presented to the jury and rejected by it." *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1352-1353 (Fed. Cir. 2011) (referring to *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, 558 F.3d 1368 (Fed. Cir. 2009)).

47

The Court's statements in *Hynix* show that the *Infineon* claim construction ruling is not dispositive of the written description priority issue. As in *Hynix*, and as further detailed below, "it would certainly be reasonable to conclude that Rambus's claims do not meet the written description requirement on the basis of *ICU Med.*" *Hynix,* 645 F.3d at 1352-53. Moreover, unlike in *Hynix*, there is no jury verdict that constrains this Court's determination of the priority issue.

As shown below, the evidence demonstrates that claims 15 and 16 of the '285 Patent are not entitled to the filing date of the '898 application. Thus, JEDEC and Park are prior art and should have been applied by the Board to reject claims 15 and 16.

### 1. The Board Relies on an Improper Legal Standard for Priority Written Description

The Board upheld the examiner's determination of priority based on this Court's decision in *Infineon* that the claim construction of "bus" was not limited to a multiplexed bus. (A45-47.) Although Micron argued that *Infineon* did not apply to the section 112/120 issue in this proceeding, the Board improperly concluded:

> Micron's contentions are unconvincing to show that *Infineon* was wrongly decided or would somehow require reaching a different result based on a written description priority analysis as opposed to its claim construction analysis.

(A44 (incorporating by reference A10489.)

48

Nevertheless, the Board is incorrect that an analysis of written description priority would have the same result as this Court's claim construction analysis in *Infineon*. This Court recognizes that a patentee may prevail on a broad claim construction, only to have the patent later declared invalid for failure to include a written description of sufficient breadth. *See, e.g., Ariad Pharms., Inc. v. Eli Lilly & Co.*, 560 F.3d 1366, 1377 (Fed. Cir. 2009).

Notably, in deciding *Hynix,* this Court cited *Infineon* only with respect to claim construction and not regarding written description. *Hynix,* 645 F.3d at 1349-53. Thus, even if *Infineon's* claim construction is correct that "bus" is not limited to a "multiplexed bus," that fact alone does not mean the specification of the '898 application provides written description support for a non-multiplexed bus as determined by the Board.

## 2. Proper Legal Standard for Determining Priority Written Description

In order for a patent claim to receive the benefit of an earlier filing date under 35 U.S.C. § 120, the invention as claimed must have been "disclosed in the manner provided by the first paragraph of section 112 of this title [in the earlier application]." 35 U.S.C. § 120; *see also Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1158 (Fed. Cir. 1998). The first paragraph of section 112 requires "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the

art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112, ¶ 1.

Courts have found three requirements encompassed by this language: "[1] describe, [2] enable, and [3] set forth the best mode." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002); *Ariad*, 598 F.3d at 1343. The issue here is whether the "invention" recited in claims 15 and 16 was described in the manner required by section 112 in the original '898 application in order to establish priority under section 120.

The written description requirement's purpose is to "ensure that the scope of the right to exclude, as set forth in the claims, does not *overreach the scope of the inventor's contribution* to the field of art *as described in the patent specification.*" *Univ. of Rochester v. G. D. Searle & Co., Inc.*, 358 F.3d 916, 920 (Fed. Cir. 2004)(emphasis added). This Court recently reaffirmed this important statutory requirement *en banc* in *Ariad*, explaining that "the description must 'clearly allow persons of ordinary skill in the art to recognize *that [the inventor] invented what is claimed.*'" *Ariad*, 598 F.3d at 1351 (emphasis added); *see also id.* ("[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date").

50

Two recent decisions from this Court have provided guidance regarding the written description requirement. In *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336 (Fed. Cir. 2005), the Court was faced with two similar independent claims (claims 1 and 21). *Id.* at 1340. Claims 1 and 21 were both directed to image processing on a computer using a discrete wavelet transformation (DWT) based compression process. *Id.* at 1340. Nevertheless, while claim 1 recited the specific way to calculate the DWT that was described in the specification, claim 21 recited the process generically. The Court affirmed the invalidity of claim 21 based on a written description violation because claim 21 was broader than the specification could support:

> The fact that claim 21 is directed to creating a seamless DWT does not mean that the claim is valid, however. The problem is that the specification provides only one method for creating a seamless DWT, which is to "maintain updated sums" of DWT coefficients. That is the procedure recited by claim 1. Yet claim 21 is broader than claim 1 because it lacks the "maintain updated sums" limitation. Thus, a person of ordinary skill in the art would understand that claim 21 is directed to a seamless DWT. But because there are no limitations in claim 21 as to how the seamless DWT is accomplished, claim 21 refers to taking a seamless DWT generically.

*Id.,* 424 F.3d at 1344.

A key factor discussed by the Court in finding claim 21 invalid was that the broad generic claim 21 covered "prior art that suffers from precisely the same problems that the specification focuses on solving." *Id.* at 1343-44. In other words,

51

by describing how the disclosed invention differs from the prior art, a specification defines both what the disclosed invention is, and importantly, what it is not.

The *LizardTech* decision also provided the following informative analogy:

> [S]uppose that an inventor created a particular fuel-efficient automobile engine and described the engine in such detail in the specification that a person of ordinary skill in the art would be able to build the engine. Although the specification would meet the requirements of section 112 with respect to a claim directed to that particular engine, it would not necessarily support a broad claim to every possible type of fuel-efficient engine, no matter how different in structure or operation from the inventor's engine.

*Id.* at 1346.

More recently, in *ICU Medical, Inc.*, this Court addressed a claim that failed to recite an element of the invention described in the specification. The patent at issue in *ICU Medical* was directed to a medical valve. *ICU Medical*, 558 F.3d at 1377. All valves described in the patent specification included a "spike"; however, the relevant claims did not require a spike. *Id.* The Court referred to the "claims as spikeless not because they exclude the preferred embodiment of a valve with a spike but rather because these claims *do not include a spike limitation*." *Id.* (emphasis added). The patentee argued that the claims were "neutral regarding whether the valve must include a spike," and therefore, covered either the presence or absence of a spike. *Id.* The Court found that the patentee violated the written

description requirement by attempting to broaden the claims to exclude an element of the disclosed invention:

> [The] asserted spikeless claims <u>are broader than its asserted spike claims because they do not include a spike limitation</u>; these spikeless claims thus refer to medical valves <u>generically</u>—covering those valves that operate with a spike <u>and</u> those that operate without a spike. But the specification describes only medical valves with spikes.

*Id.* at 1378 (emphasis added).

### 3. The Memory Device "Invention" Disclosed in the '285 Patent Requires an Interface to a Narrow Multiplexed Bus

In resolving the issue of whether claims 15 and 16 of the '285 Patent are entitled to claim priority to the '898 application, the first step is to determine what "invention" is described in the '898 application. *Tronzo*, 156 F.3d at 1159 (explaining that the asserted patent "describes the <u>invention</u> as a 'trapezoid,' a 'truncated cone,' or a cup of 'conical shape'").

As the following analysis shows, the "invention" of the '898 application required a bus interface that includes signal lines over which substantially all address, data, and control information is carried. Because the address, data, and control information is carried over the same lines, the information must be "multiplexed," or "time shared," in that each of the different types of information (address/data/control) is sent over the common set of bus lines at different times. (*See* A1873(42:20); *see also* A1960(Fig.6).) The '898 application describes in detail this "multiplexed bus" invention.

53

From its very start, the '898 application makes clear that the "invention" is directed to a new "bus" interface and architecture. The "Field of the Invention" describes the "invention" as follows:

> An integrated circuit <u>bus interface</u> for computer and video systems is described which allows high speed transfer of blocks of data, particularly to and from memory devices, with reduced power consumption and increased system reliability. A new method of physically implementing <u>the bus architecture</u> is also described.

(A1832(1:10-15)(emphasis added).) The "new bus interface" is also described as "[o]ne *object of the present invention*." (A1837(6:8-9)(emphasis added).) Another "object of the invention" is described as "a method for transferring address, data and control information over a relatively narrow bus." *(*A1837(6:22-23).)

Similarly, the "Summary of the Invention" explains that the "present invention" requires memory devices to be connected to this disclosed narrow multiplexed bus:

> The <u>present invention</u> includes a memory subsystem comprising at least two semiconductor devices, including at least one memory device, <u>connected in parallel to a bus, where the bus includes a plurality of bus lines for carrying substantially all address, data and control information needed by said memory devices</u>, where the control information includes device-select information and <u>the bus has substantially fewer bus lines than the number of bits in a single address, and the bus carries device-select information without the need for separate device select lines connected directly to individual devices</u>.

(A1838(7:10-19)(emphasis added).) Indeed, the very next paragraph describes how the prior art must be "modified" in accordance with the purported invention to allow such memory devices to include an interface to the "new bus":

> [A] standard DRAM 13, 14, ROM (or SRAM) 12, microprocessor CPU 11, I/O device, disk controller or other special purpose device such as a high speed switch is modified to use a wholly bus-based interface rather than the prior art combination of point-to-point and bus-based wiring used with conventional versions of these devices. The new bus includes clock signals, power and multiplexed address, data and control signals.

(A1838-39(7:20-8:2)(emphasis added); *see also* A1839-40(8:25-9:3)("New bus interface circuits *must be added* and the internals of prior art DRAM devices *need to be modified* so they can provide and accept data to and from the bus at the peak data rate of the bus") (emphasis added).)

The '898 application also explains how the multiplexed bus interface is used within the disclosed system:

> In the system of this invention, DRAMs and other devices receive address and control information over the bus and transmit or receive requested data over the same bus. Each memory device contains only a single bus interface with no other signal pins.

(A1839(8:9-13)(emphasis added).) Thus, the new bus interface uses the same bus lines to carry address, control, *and* data information. Moreover, the patent excludes the possibility of signal pins (connections to signal lines) other than to the address/control/data bus lines.

55

The Detailed Description also consistently describes the "present invention" as requiring devices adapted to interface to this narrow multiplexed bus:

> The <u>present invention is designed to provide a high speed,</u> <u>multiplexed bus</u> for communication between processing devices and memory devices <u>and to provide devices adapted for use in the bus</u> <u>system</u>. . . . The bus consists of a relatively small number of lines connected in parallel to each device on the bus. <u>The bus carries</u> <u>substantially all address, data and control information needed by</u> <u>devices for communication with other devices on the bus</u>.

(A1842(11:16-25)(emphasis added).)

The fact that each bus line carries multiple types of information is also shown in Figure 4 (reproduced below).



**'898 application at FIG. 4 (A1959)**

Although the '898 application describes certain embodiments of the multiplexed bus interface as "preferred" or "examples," (*see*, *e.g.*, A1840(9:16-18)(providing specific stub capacitances and inductances); A1843(12:8-10)(using 40-bit addresses)), the '898 application <u>never</u> describes the narrow multiplexed bus interface itself as merely preferred or exemplary. Nor does the '898 application describe any alternative bus interface structure. Instead, the clear and unambiguous

56

disclosure is that the "new bus" interface is a necessary part of the purported invention.

The original claims of the '898 application directed to sending or receiving data are limited to devices adapted to interface to the narrow multiplexed bus by reciting a "bus including a plurality of bus lines for carrying substantially all address, data and control information needed by said memory device." (*See*, *e.g.*, A1894(63:4-6)(claim 1); *see also id.* at independent claims 13, 25, 46, 56, 68, 82, 95, 97, 103, 106, 108, 111, 114, 116, 118, 121, 124, and 135 at A1896-97; A1900-01; A1907-08; A1912; A1917-18; A1942-25; A1931-32-44; A1948-49.)

Indeed, only two original independent claims did not expressly describe interfacing to the multiplexed bus: claim 73, which is directed to the specific early/late clocking scheme disclosed in the '898 application, and claim 91, which is directed to the specific packaging scheme disclosed in the '898 application. Neither of those claims is directed to sending or receiving data to or from a memory device. The '898 application separately described the specific early/late clock and specific packaging scheme described in the specification as separate inventions. (*See* A1836(5:19-20)("The clocking scheme used in this invention has not been used before"); A1837(6:13-15)("Another object of this invention is to provide a clocking scheme to permit high speed clock signals to be sent along the

bus with minimal clock skew between devices."); A1873(42:7)("Low Power 3-D

Packaging"); A1873(42:19)("an innovative 3-D packaging technology").)

### 4. The "Prior Art" to the '898 Application Was Distinguished Based on the Bus and Interface Structure

In addition to the above passages describing the "invention" disclosed in

the '898 application, a second important source of information comprises the '898

application's description of what the invention is not. *LizardTech*, 424 F.3d 1343-

44.

In the Background of the Invention, the applicants distinguished the prior art

from the claimed invention as separating the address lines, data lines, and control

lines:

> Each memory device typically is connected in parallel to a series of
> address lines and connected to one of a series of data lines. When the
> computer seeks to read from or write to a specific memory location,
> an address is put on the address lines and some or all of the memory
> devices are activated using a separate device select line for each
> needed device.

(A1832(1:22-28)(emphasis added.)

The '898 application also includes a "Comparison With Prior Art" section,

in which purported differences between the disclosed "invention" and the prior art

are discussed. All but one reference is distinguished on the basis that it does not

disclose the multiplexed bus.

- In distinguishing U.S. Patent No. 3,821,715 to Hoff *et al.*, the
  application states, "most important, not all of the interface signals

58

between the devices are bused (the ROM and RAM control lines and the RAM select lines are point-to-point)." (A1834(3:15-18).)

- In distinguishing U.S. Patent No. 4,315,308 to Jackson, the application states, "again, not all of the interface signals are bused." (A1835(4:2-3).)

- In distinguishing U.S. Patent No. 4,449,207 to Kung *et al.*, the application states, "[t]he external interface to this DRAM is conventional, with separate control, address and data connections." (A1835(4:6-7).)

- In distinguishing U.S. Patent Nos. 4,764,846 and 4,706,166 to Go, the application states, "[the disclosed] pages are difficult to use because of point-to-point wiring required to interconnect conventional memory devices with process elements . . . . No attempt is made to solve the problem by changing the interface." (A1835(4:10-14).)

- In distinguishing U.S. Patent No. 3,969,706 to Poebsting *et al.*, the application states, "[t]he address is two-way multiplexed, and there are separate pins for data and control (RAS, CAS, WE, CS). The number of pins grows with the size of the DRAM, and many of the connections must be made point-to-point in a memory system using such DRAMS." (A1835(4:16-20).)

- In distinguishing "backplane buses" in general, the application states "[n]one of the buses described in patents or other literature use only bused connections. All contain some point-to-point connections on the backplane." (A1836(5:13-15).)

- Finally, in distinguishing U.S. Patent No. 4,646,279 to Voss, the application states "[t]he rest of the interfaces to the DRAM (RAS, CAS, multiplexed address, etc.) remain the same as for conventional DRAMs." (A1837(6:5-7).)

The only prior art reference described in the "Comparison With Prior Art" section for which a bus structure was not discussed is U.S. Patent No. 4,247,817 to Heller, in which the clocking scheme, rather than the transfer of

address/data/control information, was described. (A1836(5:22-25).) As discussed above, the clocking scheme was described as a separate inventive concept from the interface to the new multiplexed address/data/control bus. (*See* A1836(5:19-20) and A1837(6:13-15).)

Another important discussion distinguishing the prior art is found in the Detailed Description section, where the applicants explain that the separate address, data, and control lines used in the prior art are replaced with the invention's multiplexed bus lines:

> There is no need for separate device-select lines since device-select information for each device on the bus is carried over the bus. There is no need for separate address and data lines because address and data information can be sent over the same lines.

(A1843(12:2-6).)

Finally, near the end of the specification, the applicants concede that many of the disclosed features had been used in the prior art, "but never in conjunction with *the bus architecture of this invention*." (A1890(59:23-25)(emphasis added).) These consistent descriptions of the prior art and how the "invention" differed from the prior art demonstrate that the invention described in the '898 application required an interface to a narrow multiplexed bus.

Because claims 15 and 16 do not limit the way in which the recited memory device communicates with the rest of the system and are not limited to the "multiplexed bus" as described in the '898 patent, claims 15 and 16 do not have

60

written description support in the '898 application. As a result, Rambus cannot claim priority to the '898 application, JEDEC and Park are prior art, and the Board erred in not applying those references against claims 15 and 16.

## VI.  **CONCLUSION**

As demonstrated above, the Board correctly determined that Micron has standing to appeal any issue favorable to patentability, including those issues raised by another requester in the merged proceeding, under 35 U.S.C. § 315. Moreover, substantial evidence supports the Board's factual findings that claim 15 and 16 of the '285 Patent are anticipated by Bennett. Therefore, Micron respectfully requests that this Court affirm the Board's decision that claims 15 and 16 are anticipated.

Alternatively, Micron respectfully requests that this Court reverse the Board's determination that claims 15 and 16 of the '285 Patent are entitled to the benefit of the earlier filing date and remand to the Board for consideration of JEDEC and Park as prior art references.

Dated: September 6, 2013                          Respectfully submitted,

/s/ Henry A. Petri, Jr.
Henry A. Petri, Jr.
James P. Murphy
Michael W. O'Neill
Margaux A. Aviguetero
Daniel P. Mullarkey
NOVAK DRUCE CONNOLLY BOVE +
QUIGG LLP

61

1875 Eye Street, NW
Eleventh Floor
Washington, DC 20006
(202) 331-7111

*Attorneys for Appellee*

# United States Court of Appeals
## for the Federal Circuit

*RAMBUS, INC. v MICRON TECHNOLOGY, INC., 2013-1192*

### CERTIFICATE OF SERVICE

I, Henry A. Petri, Jr. being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **September, 2013**, I caused the foregoing **Brief for Appellee to be** electronically filed the with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

J. Michael Jakes
James R. Barney
Molly R. Silfen
Aidan C. Skoyles
FINNEGAN HENDERSON FARABOW GARRETT
DUNNER LLP
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000
mike.jakes@finnegan.com
james.barney@finnegan.com
molly.silfen@finnegan.com
aidan.skoyles@finnegan.com

*Attorneys for Appellant RAMBUS, Inc.*

Additionally, I will cause two paper copies will also be serviced by mailed to the above counsel via Priority Mail when the paper copies are sent to the Court.

63

Upon acceptance by the Court of the e-filed document, six confidential paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

September 6, 2013                              /s/ Henry A. Petri, Jr.
                                              Henry A. Petri, Jr.
                                              Counsel for Appellee

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

   x      The brief contains 13,886 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

   _      The brief uses a monospaced typeface and contains lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   x      The brief has been prepared in a proportionally spaced typeface using MS Word 2007 in a 14 point Times New Roman font or

   _      The brief has been prepared in a monospaced typeface using MS Word 2002 in a ___ characters per inch_____ font.

Date   September 6, 2013             /s/ Henry A. Petri, Jr._____
                                     Henry A. Petri, Jr.
                                     Counsel for Appellee